## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

**MOTTLEY FAMILY ENTERTAINMENT, INC.**
**D/B/A PUTT-PUTT FUN CENTER**
**416 Constant Friendship Blvd.**
**Abingdon, Maryland 21009 (Harford County)**

**MOTTLEY GROUP, LLC.**
**416 Constant Friendship Blvd.**
**Abingdon, Maryland 21009 (Harford County)**

**MOTTLEY FAMILY ENTERTAINMENT**
**PROFIT SHARING PLAN AND TRUST**
**416 Constant Friendship Blvd.**
**Abingdon, Maryland 21009  (Harford County)**

**MOTTLEY ENTERTAINMENT DEFINED**
**CONTRIBUTION PENSION PLAN**
**416 Constant Friendship Blvd.**                           **Case No. _____**
**Abingdon, Maryland 21009 (Harford County)**

**JAMES C. MOTTLEY a/k/a  JAY MOTTLEY**
**416 Constant Friendship Blvd.**
**Abingdon, Maryland 21009 (Harford County)**

**DANA MOTTLEY**
**416 Constant Friendship Blvd.**
**Abingdon, Maryland 21009 (Harford County)**

      **Plaintiffs**

      **v.**

**WACHOVIA BANK, National Association**
**301 South College Street**
**Charlotte North Carolina 28288 d/b/i/ Harford County**

      **SERVE ON:  CSC LAWYERS**
      **INCORPORATING SERVICE CO.**
      **7 St. Paul Street       Suite 1660**
      **Baltimore, MD  21202**

      **Defendant**

## COMPLAINT FOR ILLEGAL TYING, MONEY JUDGMENT
## AND DECLARATORY RELIEF

Mottley Family Entertainment, Inc., d/b/a Putt-Putt Fun Center, ("Mottley Family Entertainment") Mottley Group, LLC., ("MG") Mottley Family Entertainment Profit Sharing Plan and Trust, ("Mottley Family Trust") and Mottley Family Entertainment Defined Contribution Pension Plan, ("Mottley Family Pension") Pension Plan") James C. Mottley a/k/a Jay Mottley, ("Jay") Dana Mottley ("Dana") file this Complaint against Wachovia Bank, N.A. and in support thereof states as follows:

## THE PARTIES

1.     Mottley Family Entertainment is a Maryland Corporation with its principal and designated place of business in Harford County, Maryland.  Mottley Family Entertainment originated in 2002 and is owned through and run by Jay.

2.     Jay and Dana are citizens of the State of Maryland and reside in Harford County, Maryland with their two children.

3.     MG is a Maryland Limited Liability Corporation with its principal and designated place of business is located in Harford County, Maryland.

4.     Mottley Family Trust's principal and designated place of business is located in Harford County, Maryland.

5.     Mottley Family Pension Plan's principal and designated place of business is located in Harford County, Maryland.

6.      Mottley Family Entertainment, MG Mottley Family Trust and Mottley Family Pension Plan.

7.      Wachovia is a National Banking Association with its designated main office located in North Carolina.  Wachovia regularly does business in Harford County, Maryland.

8.      Wachovia is an FDIC insured financial institution organized under the laws of the United States which both accepts demand deposits and is engaged in the business of making commercial loans.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction by reason of a Federal Question pursuant to 28 U.S.C. § 1331 and 12 U.S.C. Section 1972 and Section 1975

10.      This Court has jurisdiction pursuant to 28 U.S.C. Section 1332. The action is between citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.

11.      Venue is proper in this district under 28 U.S.C. Section 1391 because a substantial part of the events or omissions giving rise to the claim occurred in Harford County Maryland.

## FACTS RELEVANT TO COMPLAINT

12.      Mottley Family Entertainment is a family fun center consisting of an arcade, two miniature golf courses, batting cages, and a large laser tag facility. Mottley Family Entertainment is located in Harford County, Maryland.  Mottley Family Entertainment hosts over 2,000 children's birthday parties per year.

13.      MG owns the real property and improvements where Mottley Family Entertainment does business as a family fun center.

14.     In the summer and early fall of 2006, Jay successfully elevated Mottley Family Entertainment into a Harford County landmark for family fun and entertainment. Mottley Family Entertainment hosted over 2,000 birthday parties in 2006.

15.     Mottley Family Entertainment generated just over a million dollars in revenue in 2006.

16.     Mottley Family Entertainment's business is an entertainment business and its revenue is fluctuates with the economy. When the economy does well, Mottley Family Entertainment's business does well.  When the economy takes a downturn, Mottley Family Entertainment's business takes a downturn.

17.     Consequently, Mottley Family's debt service must be flexible and its ability to refinance must be available in the event the economy takes a downturn, the business needs to grow, or the business is sold.

18.     Mottley Family Entertainment generates less revenue from late November through February due weather conditions limiting outdoor miniature golf and batting cage activity.  Jay realized that he could reduce seasonal fluctuations, increase cash flow and generate more profits by adding a family restaurant to the Family Fun Center.

19.     Jay also needed $300,000.00 to finish the buyout of a former shareholder.

20.     Currently, Mottley Family Entertainment was paying interest on a variable interest rate loan at a rate of Wall Street prime + ½ % on a 2.9 million dollar loan with First Mariner Bank ("FMB"). As of December 2006, the amount due on the FMB Loan was approximately 2.3 million dollars.

21.     Jay researched and prepared a business plan for the restaurant and calculated that he would need $300,000.00 to add the restaurant.  He anticipated that the cash flows generated from the restaurant would generate a positive cash flow to not only pay down the additional cost of debt service associate with a $600,000.00 increase in loan funding, but pay down the 2.3 million dollars as well.

22.     When Jay sought additional financing, for Mottley Family Entertainment, he was looking for a loan that provided for: (1) a fixed rate of interest; and (2) a loan did not have any pre-payment penalty.

23.     In September 2006, Jay met with Mike McIntyre ("Mr. McIntyre"), a Senior Vice President at Wachovia.

24.     The Plaintiffs were not doing any business with Wachovia in September 2006.

25.     Jay advised Mr. McIntyre of his loan conditions for Mottley Family Entertainment. Jay further advised Mr. McIntyre that he was looking to either sell the business or refinance in a year or two once the restaurant was built and cash flow generated.

26.     Mr. McIntyre consulted with the Wachovia Credit Manager, Chuck Schick ("Mr. Schick").  After consulting with Mr. Schick, Mr. McIntyre advised Jay that Wachovia would provide the equivalent of a fixed rate loan which consisted of a variable rate loan and a mandatory interest rate swap.

27.     Mr. McIntyre's representations and conduct, alleged throughout this Complaint were done in his capacity as an officer and/or authorized agent of Wachovia.

28.     Mr. McIntyre told Jay that this was the only type of loan that Wachovia would provide to Mottley Family Entertainment.

29.     Wachovia did not give Mottley Family Entertainment a choice of the usual and traditional fixed rate loan.

30.     Wachovia did not give Mottley Family Entertainment a choice of a variable rate loan without the interest rate swap.

31.     Jay told Mr. McIntyre that he had never heard of such a thing as an interest rate swap.

32.     Mr. McIntyre admitted to Jay that he too was unfamiliar with the use of interest rate swaps.  However, Mr. McIntyre advised Jay that the interest rate swap operated the same as a usual fixed rate loan.

33.     Mr. McIntyre then presented Mottley Family Entertainment with the Summary of Terms and Conditions Letter dated October 13, 2006.  A copy of the Commitment Letter is attached hereto as Exhibit 1.

### THE COMMITMENT LETTER AND THE INOCUOUS SWAP

34.     The Commitment Letter presented what appeared to be the equivalent of a fixed rate loan.  The Commitment Letter provided for a variable rate of interest at the rate of 1-month LIBOR plus 2.75% coupled with a fixed rate interest rate swap, the fixed rate of which would be determined by the market.  As of October 13, 2006, Wachovia represented that a fixed rate interest rate swap would be 8.14%.  However, Wachovia never disclosed to Jay how the fixed rate was actually determined.

35.     The Commitment Letter did not reflect that there was any pre-payment penalty on the loan.

36.     The Commitment Letter also stated that the interest rate swap would be for the full amount and term of the loan. Jay interpreted this section to mean that the interest rate swap would be in place until he paid off the loan through either re-financing or through the sale of the Fun Center.

37.     The Commitment Letter did not disclose that the interest rate swap was a distinct and separate investment which survived the loan in the event the loan was paid off early.

38.     The Commitment Letter was devoid of any term regarding a termination fee or an unwinding fee used in connection with an interest rate swap.

39.     The Commitment Letter was devoid of any information that the Plaintiffs could incur a $300,000.00 penalty or greater if the interest rate swap was unwound or terminated.

40.     The Wachovia Commitment Letter effectively mandated that Mottley Family Entertainment obtain the interest rate swap only from Wachovia by stating "Borrower will be required to hedge the floating interest expense on this credit facility by entering into an interest rate swap."

41.     Although the Commitment letter uses the phrase "(or another counter-party acceptable to the lender"), this phrase is rendered meaningless by the following:

   a) Wachovia does not permit such a counter party to intervene on loans of this size because of the hidden profits and hidden fees generated by keeping the swap.

   b) Wachovia has the unilateral ability to reject, delay, or control other vendors of a Swap Product.

c) Wachovia never provided a list of approved counter-parties to the Plaintiffs.

d) The Commitment Letter's requirement that the Swap be secured by the same collateral eliminated any competitors in the swap market.

e) Wachovia's conduct throughout the loan process delayed Plaintiffs in being able to look for another counter-party.

f) The clandestine and unregulated nature of the interest rate swap market makes it extremely difficult to obtain proper information to make an educational decision on choosing a swap participant.

42.    At the time Jay received the Commitment Letter and signed it, Jay had no idea what the swap market was and considered the interest rate swap like a mortgage; that it was part and parcel of the loan and when the loan was paid, the swap would be released just like the mortgage.

43.    Unlike insurance products, the interest rate swap product is a highly specialized and sophisticated investment unfamiliar to family businesses similar to Mottley Family Entertainment's size.  The investment requires expert knowledge of yield curves and financial models with names like the Monte Carlo simulation [named for the city's famous roulette wheels].

44.    On or about October 20, 2006, Jay signed the Commitment Letter on behalf of Mottley Family Entertainment.

45.    Wachovia provided Mottley Family Entertainment with no alternative hedges, or fixed rate alternatives.

46.    The Commitment Letter required that the remaining plaintiffs guaranty the Swap and that the Swap be secured by the Real Property and the Mottley Family Entertainment assets.

47.    Wachovia crafted its Commitment Letter in such a manner to give the illusory appearance that the interest rate swap was part and parcel of the loan.

48.     The Commitment Letter required Mottley Family Entertainment to pay a $6,000.00 fee which was non-refundable if Wachovia approved the credit.

49.     On October 20, 2006, Mottley Family Entertainment signed the Commitment Letter and paid the $6,000.00 commitment fee.  If Wachovia approved the credit, then the $6,000.00 fee would be non-refundable.

50.     Wachovia subsequently approved the Commitment Fee, and the Loan was set to close on December 19, 2006.

51.     During the two months before closing, Mottley Family Entertainment hired engineers and lawyers to assist it in preparing the designs and applying for permits necessary to build the restaurant.

52.     Wachovia never provided Jay with any documentation on interest rate swaps or how they worked until six working days before the loan closed.

53.     During this time, Jay sought the assistance of Mr. McIntyre to explain the interest rate swap documentation.

54.     Mr. McIntyre was unable to explain how an interest rate swap worked.

55.     On December 19, 2006, two hours before closing, Jay had a conversation with Ryan Hale ("Mr. Hale"), Vice President of Wachovia.  Mr. Hale explained the interest rate in some minor detail.

56.     Jay advised Mr. Hale that Mottley Family Entertainment would rather take the loan without the swap.  Mr. Hale told Jay that if the Mottley Family Entertainment did not take the interest rate swap with Wachovia, it would not get the Loan.

57.     Jay had already committed to the Loan in both time and effort.  Jay quit soliciting other banks for loans.  For Jay to find a new lender and close on another would take another four months.

58.     If Jay did not obtain the loan soon, the restaurant would be delayed and not open until after his busy season had passed and Jay would have to wait another year, possibly two years, to finish the restaurant.

59.     Mr. McIntyre then presented Jay with two signature pages and told Jay that Mottley Family Entertainment had to sign these two pages for the interest rate swap.  Mr. McIntyre also presented Jay with a swap confirmation page where he told Jay that Mottley Family Entertainment would have to sign before closing.  Jay signed two single signature pages and the swap confirmation document.  Copies of these documents are attached to this Complaint as Exhibit 2.

60.     Because the Plaintiffs were already committed in time and money to the new restaurant, they felt they had no choice but to sign the Loan Documents.  At the time they signed these documents, they were still unaware that penalties on the Swap could exceed $300,000.00.

61.     The Confirmation Sheet reflected that the fixed rate for a swap on December 19, 2006 was 7.99%.

62.     The actual rate for a similar fixed rate swap on December 19, 2006 was 7.615%. Consequently, Wachovia inflated the initial fixed rate by 37.5 basis points.

63.     In this case, the inflated spread is in excess of $40,000.00 at the present value.

64.     On December 19, 2006 the Plaintiffs closed on the loan which consisted of two loans. The first was a 2.9 Million Dollar Loan which refinanced Mottley Family Entertainment's previous loan with first Mariner Bank and paid off Jay's former partner; and (2) a $300,000.00 line of credit which was to be used to build the restaurant. Copies of the Loan Agreement, Promissory Note and Line of Credit Note are attached hereto as Exhibits 3, through 5, respectively.

65.     The Loan and interest rate swap were guaranteed by the Plaintiffs Dana, Jay, Mottley Family Entertainment Trust, Mottley Family Pension Plan and MG.  Copies of the guaranties are attached as Exhibits 6, through, 9, respectfully.

66.     MG executed an Indemnity Deed of Trust dated December 19, 2006.  A copy of the IDOT is attached hereto as Exhibit 10.

67.     Exhibits 3-10 are collectively referred to as the Loan.

68.     For each loan document that Jay signed, either in his capacity, as an authorized agent for one of the Mottley Family Entities, or individually, he initialed every page other than the signature page which Jay signed.

69.     After the Loan was executed, Jay continued with his restaurant plans.   Local government delays, however, prevented certain permits from being approved until September 2007.

70.     In June 2007, Wachovia unilaterally terminated the line of credit preventing the restaurant from being built.

71.     At the time Wachovia approved the loan in 2006, Wachovia knew that cash flow from the restaurant would be required to repay the loan.

72.     When Wachovia terminated the line of credit, it left Mottley Family Entertainment in a pinch.  The Plaintiffs had used much of their own money towards building the restaurant.  They had been saving the line of credit for the actual build out of the restaurant.

73.     Jay continued to work on the restaurant until he ran out of money.

74.     In December 2007, Jay found a lender in Harford County, to refinance the loan at a fixed rate without a prepayment penalty.   The National Bank of the Rising Sun ("NBRS") approved a loan would provide the funds necessary to build the restaurant and payoff Wachovia.

75.     Interest rates tumbled in early 2008 when financial institutions, including Wachovia, began to report huge losses resulting from their investment in mortgage backed securities and credit swap speculation.

76.     The economy took an immediate downturn in 2008.

77.     The interest rate tumbled by over 200 basis points in order to counteract a threatened recession.

78.     The NBRS loan was set to close in March 2008.

79.     Wachovia advised Jay that there was a "termination fee" of $258,139.02 in addition to the $2,851,901.02 due on the loan.

80.     On or about March 28, 2008, at Jay's request, Wachovia sent Jay an ISDA Master Agreement, a Schedule, and the swap confirmation claiming that they were the documents that Jay signed, however, neither of these agreements contained pages with Jay's initials. Attached to each document were the sole signature pages that Jay had signed on behalf of the Mottley Family Company which he had faxed to Ryan Hale in North Carolina. Copies of Wachovia's ISDA Master Agreement, Schedule, and Confirmation Report provided to Jay on or about March 28, 2008 are attached to this Complaint, respectfully as Exhibits 11 through 13.  These documents are hereinafter referred collectively as the Wachovia Interest Rate Swap Investment.

81.     Wachovia explained to Mottley Family Entertainment, that this fee was a present value calculation. This calculation, however, does not appear on the Wachovia ISDA Agreements provided to Jay on March 28, 2008.

82.     Wachovia refused to waive the termination fee and as a result, Wachovia prevented Mottley Family Entertainment from refinancing with NBRS.

83.     In May, 2008, Jay was able to finally obtain financing for the restaurant in the amount of $450,000.00 at a variable rate of LIBOR +3.25%, a rate just .5% higher than the Wachovia Rate.

84.     M&T would have refinanced the 2.9 million dollar loan in addition to the $450,000.00 restaurant addition. However, the Interest Rate Swap prepayment penalty prevented that from happening.

85.     As a result, Mottley Family Entertainment was forced to continue to pay swap payments and could not refinance due to the interest rate swap penalty imposed by the Wachovia Interest Swap Investment.

86.     The Wachovia Interest Rate Swap Investment Payments coupled with the inability to refinance, and downturn in the economy resulted in Mottley Family Entertainment to fall behind in its bills.

87.     To date, Mottley Family Entertainment has paid Wachovia net interest swap payments of $66,573.50.

88.     Based on information and belief, Mottley Family Entertainment has lost additional revenue caused by Wachovia's forced Interest Rate Swap Investment that would have been generated by the restaurant clientele in the Fun Center.

89.     On or about June 15, 2009, Wachovia terminated the Interest Rate Swap Investment claiming that $278,715.62 was owed.

90.     The Plaintiff's dispute that there are no amounts due on the Loan for reasons set forth in the following paragraphs.

91.     Mottley Family Entertainment claims that money is owed to it.

92.     Wachovia claims there are amounts due on the Loan.

93.     Mottley family disputes that amounts are due on the Loan as set forth in the following paragraphs.

94.     Consequently there is a genuine issue of controversy among the parties.

**COUNT I
ILLEGAL TYING ARRANGEMENT
12 U.S.C. SECTION 1972**

95.     The Plaintiffs incorporate the previous paragraphs into Count I of this Complaint.

96.     Wachovia, is a Bank defined under 12 U.S.C. §1971 incorporating 12 U.S.C. §1841 and 12 U.S.C. Section 1813.

97.     Plaintiffs are customers of Wachovia in connection with the Loan and Wachovia Interest Rate Swap Investment.

98.     Wachovia conditioned the Loan, on the Mottley Family Entertainment's purchase of (1) the Wachovia Interest Rate Swap Investment; (2) the remaining Plaintiffs' guaranteeing of Wachovia Interest Rate Swap Investment; and (3) MG executing the IDOT guaranteeing Wachovia's Interest Rate Investment.

99.     The Wachovia Interest Rate Swap Investment is not a loan, discount, deposit, or trust service.

100.    The Wachovia Interest Rate Swap Investment constitutes an additional credit, property or service that is not related to or usually provided in connection with a loan discount or trust service.

101.    The Wachovia Interest Rate Swap Investment is not a traditional bank product.

102.    The Wachovia Swap Investment is a separate and distinct investment from the Wachovia Loan.

15

103.    Once executed, the Wachovia Interest Rate Swap Investment exists even if the Loan does not materialize.

104.    If the Loan was paid off early, obligations under the Interest Rate Swap continue.

105.    Unlike traditional and usual products associated with securing a loan - (mortgages, guaranties, and even insurance requirements protecting mortgage property) – The Wachovia Swap Investment continues even if the loan is pre-paid.

106.    Wachovia goes to great lengths to keep their interest rate swap investments separate and distinct from the loan.

107.    The term "interest rate swap" is excluded from the Wachovia definition of "Loan Documents."

108.    The 2.9 Million Dollar Promissory Note Provides:

> The term **"Loan Documents"**, as used in this Note and the other Loan Documents, refers to all documents executed in connection with or related to the loan evidenced by this Note and any prior notes which evidence all or any portion of the loan evidenced by this Note, and any letters of credit issued pursuant to any loan agreement to which this Note is subject, any applications for such letters of credit and any other documents executed in connection therewith or related thereto, and may include, without limitation, a commitment letter that survives closing, a loan agreement, this Note, guaranty agreements, security agreements, security instruments, financing statements, mortgage instruments, any renewals or modifications, whenever any of the foregoing are executed, ***but does not include swap agreements (as defined in 11 U.S.C. § 101, as in effect from time to time).***

109.    Wachovia's own internal guidelines instruct that the term "loan documents" should always be defined to exclude any swap agreement and provides in part.

A term such as "loan documents" (however described) should **exclude** any swap agreement.  Because this term is typically used throughout the loan agreement for a variety of different purposes, it should **always** be defined as **excluding** any swap agreement.  For example, the term "loan documents" might refer to "any document executed in connection herewith or required hereunder," and this could be construed as including a swap agreement entered into by the Borrower to hedge the loan.  ***This could mean unwanted restrictions or requirements for swap agreements.***

A copy of a portion of Wachovia's internal guidelines obtained from a general Google internet search is attached hereto as Exhibit 14.

110.    Wachovia incorrectly characterizes Wachovia's Interest Rate Swap Investment as borrower hedge against rising interest rates.  However, a usual/traditional fixed rate loan accomplishes the same task without losing the flexibility to refinance.

111.    The Wachovia Interest Rate Swap Investment imposes a greater risk of default than any interest rate increase.  Small businesses, like Mottley Family Entertainment, that experience growth, need to sell, or need to increase their cash flow in a down economy and are prevented from doing so by the prohibitive volatile nature of  pre-payment penalties that are imposed by the Wachovia Interest Rate Swap Investment.

112.    The Wachovia Interest Rate Swap Investment penalty created such a substantial risk that Mottley Family Entertainment was prohibited from expanding and increasing its cash flow.  Further, Mottley Family Entertainment was forced to endure higher interest rates in the form of a Swap Payment when the market entered into a significant downturn.

113.    Information obtained from the FDIC reflects that in 2006 eleven FDIC insured financial institutions engaged in over 99% of the interest rate swap speculation among the then

existing 8691 FDIC insured banks. Wachovia was ranked no. 4 out of the top eleven in this category.

114.    In 2006, only 344 out of 8691 FDIC insured financial institutions carried an interest rate swap notional balance, an indicator that only these banks were dealing with Interest Rate Swap Agreements with their customers.

115.    In 2006, only three FDIC Insured financial institutions chartered in the State of Maryland held an interest rate swap notional balance, an indicator that only these banks were dealing with interest Rate Swap Agreements with their customers.

116.    The remaining 109 Maryland Chartered FDIC financial institutions held no interest rate swap notional balance.

117.    Wachovia's practice of mandating that interest rate swaps with loans has an anticompetitive effect on small banks who don't speculate in the investment swap market and are also competing for commercial loans.

118.    Wachovia's benefits by using interest rate swaps, an unusual/untraditional product, as opposed to the usual/traditional fixed rate lending is to benefit by: (1) obtaining a higher than market value interest rate swap investment; (2) Obtaining hidden penalties and fees; and (4) deceptively taking business from 90% of the financial institutions that only sell usual/traditional loan products

119.    Based on information and belief, until 2006, Interest Rate Swaps for amounts under ten million dollars were not permitted.

120.    The Wachovia Interest Rate Swap Investment constitutes an illegal tie-in by Wachovia under 12 U.S.C. Section 1972 and related statutes ("Illegal Tie-in").

121.    That as a result of Wachovia's Illegal Tie-In, Mottley Family Entertainment has incurred compensatory damages in excess of $100,000.00.

122.    That the Wachovia Interest Rate Swap Agreement is void for being an Illegal Tie-In.

123.    That the Wachovia Loan is void as part of an illegal tie-in.

124.    That the Wachovia Guaranties and IDOT's are void because they guaranty the obligation of the Illegal Tie-In.

125.    That pursuant to 12 U.S.C. § 1975, Mottley Family Entertainment, is a person entitled to treble damages in excess of $300,000.00 plus attorney's fees and costs.

126.    Wachovia under 12 U.S.C. Section 1972 and related statutes ("Illegal Tie-in").

127.    That as a result of Wachovia's Illegal Tie-In, Mottley Family Entertainment has incurred compensatory damages in excess of $100,000.00.

128.    That the Wachovia Interest Rate Swap Agreement is void for being an Illegal Tie-In.

129.    That the Wachovia 2.9 million dollar promissory note and loan agreement is void as part of an illegal tie-in.

130.    That the Wachovia Guaranties and IDOT are void because they guaranty the obligation of the Illegal Tie-In.

131.    That pursuant to 12 U.S.C. § 1975, Mottley Family Entertainment, is a person entitled

to treble damages in excess of $300,000.00 plus attorney's fees and costs.

**WHEREFORE**, Plaintiff's request that this court enter do the following:

a)  Enter Judgment in favor of Plaintiffs and against Wachovia by declaring Wachovia Investment Swap Agreement and Loan as an illegal tie-in pursuant to 12 U.S.C. Section 1972.

b)  Enter Judgment in favor of Mottley Family Entertainment in an amount in excess of $300,000.00;

c)  Declare the Loan and Wachovia Interest Rate Swap Investment void;

d)  Enter Judgment in favor of the Plaintiffs and against Wachovia for Plaintiffs attorney's fees costs and expenses incurred in this matter; and

e)  For other just and proper relief.

/s/ Troy C. Swanson
Troy C. Swanson  #05806
Cohen & Swanson, P.C.
1220 E. Churchville Rd. Suite 300
Bel Air, MD  21014
Phone  410-420-0700
Fax     410-420-0222
Email  Troy@commerciallawyer.com
Attorneys for the Plaintiffs